EDWIN PLUMMER *versus* CHARLES JARVIS & al.

The resolve of Jan. 24, 1839, authorizing and requiring the Land Agent to prevent "all persons found trespassing on the territory of this State, as bounded and established by the treaty of 1783," and with force, if necessary, from committing such trespasses, is equally applicable to such as may commit them on the lands of private persons and to such as trespass upon the public lands of the State.

TRESPASS for breaking and entering the camp of the plaintiff in the county of Aroostook, and taking and carrying away various articles in use in lumbering operations. There was also a count for a trespass on the person, and false imprisonment.

Jarvis, at the time of the alleged trespass, was provisional

Land Agent of the State, and as such justified the acts com-
plained of under the authority of the resolves of 1839, and
especially that of Jan. 24, 1839.   The other defendant acted
under Jarvis.

The plaintiff was once an inhabitant of this State, but at
the time of the breaking up of his camp and lumbering opera-
tions, and for about eleven years prior thereto, he had lived in
New Brunswick.   Before the commencement of this suit, he
had come over the lines into this State.   The plaintiff, at the
time of the alleged trespass, was lumbering on the Plymouth
township, a few miles from Fort Fairfield ; which township was
originally granted by the Commonwealth of Massachusetts to
the town of Plymouth and to Gen. Eaton, and was at this
time unsettled, and the property of private persons living
within the States of Massachusetts and Maine.    The acts
complained of were there committed.    The lumber hauled off
by the plaintiff was hauled into the Aroostook river within the
limits of New Brunswick, which, however, was the most con-
venient point of landing the timber.

TENNEY J. then presiding, instructed the jury, that if they
were satisfied that the place where the articles were alleged to
have been taken, was a part of the territory in dispute between
this State or the United States and Great Britain, evidence
having been adduced for the purpose of showing that fact, the
defendants were justified under the resolves of the State.   The
jury returned a verdict for the defendants, and, in written an-
swers to certain inquiries put to them by consent, found ; that
the defendants did take the property of the plaintiff, named in
his writ, of the value of $513,47 ; that at the time the articles
were taken, the plaintiff was engaged in cutting timber on
lands within the territory of this State, and was upon the
territory in dispute between the United States and Great Brit-
ain ; that the plaintiff was not then cutting timber on land
belonging to the State, but to certain individuals ; that he had
no authority from the owners of the land or the timber, or
from any of them ; that at the time he had his residence in
the Province of New Brunswick and obtained his supplies for

carrying on his lumbering operations from St. John in that Province; that he had taken up his residence in New Brunswick as a permanent home, and had resided there about eleven years; that it was necessary, in the opinion of the Land Agent, to break up the plaintiff's camp to prevent trespasses on the lands owned by the State; that the defendants, in the acts complained of, acted in good faith; that the plaintiff was engaged in cutting said timber, when he was taken and carried to Fort Fairfield; and that he sustained no damages thereby.

The verdict was to be set aside, altered, or amended, as the legal rights of the parties might require.

*B. Bradbury*, for the plaintiff, said that these resolves gave great and extraordinary powers to the Land Agent, and should therefore be construed strictly. But they do not justify these acts of the defendants. They relate exclusively to the public lands. The title of the resolves so say; and the true construction is, that they relate only to the public lands within the disputed territory.

If it be said, that the acts were done to prevent his committing of trespasses on the public lands, the answer is twofold; the resolve does not authorize it; and it could not be done legally, without first having offered compensation. *Comings* v. *Bradbury*, 1 Fairf. 447.

*T. J. D. Fuller*, for the defendants, said that the resolves were remedial, and therefore to be construed liberally, if any construction were to be given to the language beyond its natural import.

The State is as much bound in justice to protect the land of individuals from the lawless depredations of foreigners, if not foreign enemies, as their own, and the language applies equally to both. The authority was given for the express purpose of preventing the trespassers from New Brunswick from plundering the lands in Maine, whether belonging to this State, to Massachusetts, or to private persons.

The defendants acted strictly within their orders from the State, and therefore are not liable. *Hodgson* v. *Dexter*, 1 Cranch, 345.

The opinion of the Court was by

Whitman C. J. — The case made out by the evidence, on the one side and on the other, does not exhibit the plaintiff as having sustained any injury, which could well excite the sympathy of honest men in his favor. He appears to have been a citizen of the United States; but, at the time of the injury complained of, had, for eleven years, been domiciled in the province of New Brunswick; and at the time of the alleged trespass, was committing depredations upon lands with-this State, to which he had no pretence of title. It was in the winter of 1839; at a time when the British, having asserted, what can scarcely be denominated otherwise than an impudent claim to a large extent of the territory of this State, and when all but actual war existed between the British authorities in New Brunswick and us, in which we were endeavoring to defend our just rights, that the plaintiff, who had expatriated himself, was seizing upon the occasion, while the confusion upon our Eastern Boundary was at its greatest height to commit depredations upon our territory; and his complaint is, that he was interrupted, and his nefarious project broken up by the defendants, acting under the authority of our government.

It would seem, now, that he places reliance upon the fact, that the place, which he pitched upon for the scene of his lawless operations, was not then owned by the State but by individual citizens of this or some other of the United States.

But there was very little chance, under this subterfuge for him to shelter himself from responsibility; for surely the government of this State is as much bound to protect the territorial right of individuals within its bounds as it is to protect its own. Indeed it is one of the primary objects in all governments to protect and insure to all their individuals the uninterrupted enjoyment of property. No government could shrink from the performance of such a duty without abandoning the object of its formation. Again, the plaintiff questions the authority of the defendants, as officers of the State, to interfere and break up his operations. It would seem that he

thinks the resolve of Jan. 24, 1839, under which they acted, did not reach the case, and authorize them to disturb trespassers ; unless they were actually committing strip and waste upon lands belonging to the State. The language of the resolve is, " that the Land Agent be and is hereby authorized and required to employ forthwith, sufficient force to arrest, detain and imprison all persons found trespassing *on the territory of this State, as bounded and established by the treaty of* 1783. And that the Land Agent be and is hereby empowered to dispose of all the teams, lumber and other materials in the hands and possession of such trespassers."

It was before a part of the general duty of the Land Agent to prosecute trespassers on the *public* lands. This resolve was passed to extend his powers for the purpose of meeting the emergency, and to render them more efficacious. It had become as indispensable, that measures should be taken to protect the property of individuals from depredation, as that of the public. Language in this resolve is used, which clearly shows, that the Legislature had in view not merely the public lands, but the territory of the State. Now what is the territory of a State ? Clearly that which is comprised within the limits of the State. The word territory is used as synonymous with country and dominion, and lexicographers so define it ; and in the resolve in this instance it is clearly so used. All our legislation will show that when the public lands only are intended, a different language is used, clearly indicating a distinction, constantly in view, between the territory of the State, and the interest of the public in portions of its soil ; the appropriate phraseology to describe which is the public lands. That the word territory was used in the resolve as synonymous with dominion, if any thing further be necessary to show the intent of the Legislature, is rendered certain by the words, " as bounded and established by the treaty of 1783," added next after the word " territory." The use of such language, and the absence of any language tending to show that a view was had only to the public lands, seems incontrovertably to show that the resolve was designed to meet in a national point

of view, the crisis in the difficulties in which the State was then involved. No other mode was left to ward off the dangers, which then threatened in a great measure to destroy not only the prosperity of the State, but also that of individuals which the State was equally bound to secure from lawless outrage and depredation.

<div align="right">

*Judgment on the verdict.*